# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

BRIT F. AUGBORNE, III,

    Plaintiff,

v.

DOCTOR, *et al.*,

    Defendants.

Case No.: 3:17-cv-00592-RCJ-WGC

**ORDER**

Re: ECF No. 44

Before the court is Plaintiff's "Motion" (ECF No. 44)[1] to amend the court's scheduling order (ECF No. 31). The court's original scheduling order was revised at Plaintiff's request at this court's status conference on October 25, 2019 (ECF No. 40), extending the discovery deadline to December 20, 2019. Plaintiff's instant motion to amend the scheduling order is denied for the reasons set forth in this order.

## I. BACKGROUND

On November 7, 2018, Senior District Judge Robert C. Jones screened Plaintiff's complaint. Judge Jones described the gravamen of Plaintiff's action as follows:

> In the First Amended Complaint (FAC), Plaintiff sues multiple defendants for events that took place while he was incarcerated by the NDOC. (ECF No. 11 at 8). The FAC alleges twenty counts and seeks declaratory relief, injunctive relief, and monetary damages. (*Id.* at 26, 29-32). Plaintiff sues Dr. Martin, Officer Alverado, Officer Benavedez, T. Stark, and the NDOC. (*Id.* at 2-7).

---

[1] Plaintiff's filing actually had no title. From the text of the document one discerns that Plaintiff is requesting the court to amend its scheduling order. (ECF No. 44 at 1.)

\* \* \*

> The FAC alleges the following: On or about March or May 2016, Plaintiff developed pain and boils on his stomach and backside, which he later learned were caused by the shingles virus. (*Id.* at 8). Plaintiff notified officers Romero and Benevedez. (*Id.*) They observed Plaintiff's condition and called medical staff, who also observed his condition. (*Id.*) It was obvious that he had serious health issues. (*Id.*) Medical staff told him to fill out a kite even though his issues were clearly serious. (*Id.*) Plaintiff spent weeks in pain. (*Id.*) Officers made calls to the medical staff because they were trying to figure out what they might be exposed to when handling Plaintiff. (*Id.* at 9). Two days after Plaintiff was placed on the emergency doctor list, but before he saw a doctor, Plaintiff was found unresponsive in his cell and was taken to Valley Hospital.[2] (*Id.*) Doctors at Valley Hospital told Plaintiff that, due to the delay, the virus had entered Plaintiff's spine. (*Id.*) When Plaintiff was released from Valley Hospital, he was prescribed Neurontin/Gabapentin for nerve pain and seizures. (*Id.*) Plaintiff continued on this medication for over a year. (*Id.*)
>
> Plaintiff subsequently was transferred from High Desert State Prison (HDSP) to Ely State Prison (ESP). (*Id.* at 10). Shortly thereafter, his "prescribed treatment was discontinued without cause." (*Id.*) Plaintiff grieved the issue with no benefit. (*Id.*) He suffered day after day and had another shingles outbreak. (*Id.*) Plaintiff was told by nurses and Dr. Martin that neither the State of Nevada nor the NDOC were authorized by the F.D.A. to issue the prescribed medications he was prescribed by the doctors at Valley Hospital. (*Id.*)
>
> Plaintiff alleges twenty counts related to these events.

(ECF No. 12 at 3-5; footnote 4 omitted.)

The majority of Plaintiff's 20 counts were dismissed, albeit without prejudice and with leave to amend. However, as pertinent to this order, Judge Jones allowed Count 8, alleging an Eighth Amendment claim for deliberate indifference to serious medical needs to proceed against "John Doe doctor at HDSP (High Desert State Prison) when Plaintiff learns that person's name."

---

[2] Although the dates of the "man down" incident were not addressed in Judge Jones' Screening Order, subsequent filings have identified that time period as being between May 13, 2016, through May 16, 2016. (ECF No. 40 at 2; ECF Nos. 41, 42, and 43.)

(ECF No. 12 at 26, ll. 4-19; ECF No. 12 at 24.)[3] Judge Jones also allowed a deliberate indifference to serious medical needs claim to proceed against Dr. Martin as alleged in Count 14. (*Id.* at 25.)

Plaintiff chose not to further amend his complaint and the action was directed to proceed on Count 8 as against Defendant John Doe doctor and on Count 14 against Dr. Martin (ECF No. 24.) Dr. Martin answered Plaintiff's amended complaint as to Count 14 on July 22, 2019. (ECF No. 30.) The court thereafter entered a scheduling order (ECF No. 31) directing discovery to be completed by October 21, 2019. Pursuant to an oral motion of Plaintiff, on October 25, 2019, the court extended the discovery deadline up to and including December 20, 2019. (ECF No. 40 at 3.)

On September 16, 2019, apparently with respect to Count 8 against "John Doe doctor," Plaintiff filed a document alleging that:

> "the unknown name doctor has been ascertained through discovery. Plaintiff has in accordance with this court's order submitted and served upon the court the second amended complaint complying with the court that said defendant be named and served in this case. The second amended complaint proceeded (sic) this motion for clarification for the court."

(ECF No. 37 at 1-2.)[4]

Plaintiff's filing was the subject of an October 25, 2019, status/discovery conference characterized by the court as a hearing on "motion re unknown named doctor." (ECF No. 40 at 1.) The court discussed with Plaintiff Augborne and Deputy Attorney General Odgers whether discovery in this case has indeed identified the name of the "John Doe doctor at HDSP" who may have been deliberately indifferent to Plaintiff's serious medical needs as averred in Count 8.

---

[3] Pursuant to the Screening Order, Plaintiff's complaint averred that "Nurse E.J. informed Defendant John Doe doctor at HDSP that Plaintiff had a serious medical situation. (ECF No. 11 at 17.) Although the doctor recognized that Plaintiff's condition was an emergency, the doctor did not schedule Plaintiff to be seen immediately. . . ." (ECF No. 12 at 12.)

[4] No second amended complaint was received by the court.

3

Despite Plaintiff's representation that "the unknown name doctor has been ascertained through discovery," the parties advised the court that the Plaintiff's medical documentation indicated that a "doctor Katabay" may have treated Plaintiff Augborne, but only *after* the "man down" incident. Dr. Katabay's only apparent role in Plaintiff's treatment was to order that Plaintiff be transported to a medical facility to receive care after Plaintiff was found to be unresponsive in his cell. (ECF No. 40 at 2.) Plaintiff stated that he "agree[d] that Dr. Katabay may not be a physician he was seeking to identify as a defendant in this action." (ECF No. 40 at 2.) Despite representations in Plaintiff's "motion" (ECF No. 37) that "the unknown name doctor has been ascertained through discovery," Plaintiff was in fact unable to identify the unknown doctor's name.

Deputy Attorney General Odgers represented that there was no indication in the Plaintiff's HDSP medical records of any other physician (other than Dr. Katabay) treating Plaintiff during the relevant May 13-15, 2016 time period when Plaintiff claimed an unknown physician supposedly denied Plaintiff a consultation with a HDSP medical provider (Count 8). Mr. Odgers expressed a willingness to produce to Plaintiff a list of HDSP medical staff on duty during the subject time frame in an attempt to determine the name, if any, of the physician who allegedly treated Plaintiff prior to the "man down" incident. Deputy Attorney General Odgers also offered to attempt to arrange a conference call between Plaintiff Augborne, and if available, two nurses who may have been on duty during the relevant time period. (*Id.*) Mr. Odgers was also directed to proceed with the proposed telephone conference with appropriate nurse personnel to discuss the possible identification of the alleged HDSP physician who treated Plaintiff. Deputy Attorney General Odgers was also directed to provide the HDSP medical staffing schedule during

4

May 13-16, 2016 time period with a copy of the schedule being submitted to Plaintiff. (ECF No. 40 at 3.)

On November 1, 2019, Defendant's counsel submitted a Notice of Compliance regarding the court's order, filed as ECF No. 41. The Notice advised the court that on the night shift when a "man down" was called, two nurses were working at HDSP. Counsel represented "upon information and belief" that "LPN Lopez would have been the nurse identified in the progress note of May 13, 2016, who instructed Plaintiff to file a kite to be seen by a physician." (ECF No. 41 at 1.)[5] Counsel further represented he had scheduled a telephonic interview in which Plaintiff would participate with Nurse Lim ("Nurse EJ") for Wednesday, November 6, 2019, stating that Ms. Lim is no longer employed by NDOC. Counsel represented his inability to contact LPN Lopez. (*Id.* at 2.) (Nurse Lim was the nurse to whom Plaintiff stated he made his request to see a physician. ECF No. 12 at 12.)

Defendant's Notice of Compliance (ECF No. 41) was discussed in greater detail at this court's status conference on November 13, 2019. (ECF No. 42.) Deputy Attorney General Odgers advised he was unable to contact LPN Lopez but was able to coordinate a future telephone conference with himself and Plaintiff with Nurse Lim. Ms. Lim was unable to identify any physician who may have been working during the May 13, 14 or 15 time period of 2016. Additionally, counsel represented he spoke with HDSP Nurse Practitioner Dante Famy who apparently worked a shift on May 13, 2016, but Nurse Famy indicated that he had no knowledge, communication or interaction with Plaintiff.

---

[5] Plaintiff's complaint alleged "Nurse E.J. informed Defendant John Doe doctor at HDSP that Plaintiff had a serious medical condition. . . ." (ECF No. 11 at 17.) Thus, while there appears to be a contradiction as to which nurse to whom Plaintiff reported his condition, the unknown doctor (if any) remains "unknown."

5

Deputy Attorney General Odgers further reviewed Exhibit B attached to Defendant's Notice of Compliance (ECF No. 43) that there was no "M.D." or "D.O." or Nurse Practitioner who worked during the subject time period.

The conclusion appeared to be that with respect to Plaintiff's allegations in Count 8 that there was no "medical provider" (i.e., M.D. or D.O.) who would have been working at HDSP at the time Plaintiff claims the alleged referral occurred. Thus, the court concluded that the Plaintiff's motion to substitute the name of a still unidentified physician in place of "John Doe doctor" was at best premature. The request – with Plaintiff's acquiescence - was denied, albeit without prejudice. (ECF No. 42 at 4.)

Plaintiff next contended that because he was housed in "closed custody" at HDSP during the relevant time period. Nurse Lim came to his cell to consult with him regarding his medical condition. During the visitation, Plaintiff asserted she (Nurse Lim) stated that she spoke with a doctor about his condition and Plaintiff's request for treatment. Plaintiff contended that on the time of the cell visitation the cell contact would have been videotaped by one of the HDSP personnel.

Accordingly, despite having denied Plaintiff's motion to amend, the court ordered Defendant's counsel to further investigate whether any cell visitation video may still exist and if it does, to provide a copy to Plaintiff. If the video does not exist, the Deputy Attorney General Odgers was to file a notice with the court advising of such.

On November 14, 2019, Defendant's counsel submitted a Notice of Compliance indicating that after contact with HDSP, it was determined that on May 15, 2016, HDSP Correctional Officers and medical staff – including Nurse EJ - responded to inmate Augborne's cell and found him

unresponsive. Plaintiff Augborne was transported from his cell to the infirmary (after which it appears he was transported to the hospital). (ECF No. 42-3 at 2-3.) [6]

The HDSP encounter with Plaintiff at his cell was, as Plaintiff suggested, the subject "video recording coverage." (*Id.*) However, after the passage of some 3 years, it appears that HDSP does not have a copy of the video which may have been made at that time. (*Id.*)

Plaintiff's motion to amend the scheduling order is predicated upon a video tape supporting his contention that his request for medical treatment. Therefore, despite Plaintiff's representation at ECF No. 44 at 2 that the video would disclose to whom the nurse relayed the Plaintiff's request to be seen by a physician, and the physician's alleged response to deny medical care to Plaintiff, the notice of compliance of Defendant's counsel indicates that no such video could discovered. Thus, the relevance on a non-existent video is misplaced and provides no basis to proceed with the substitution of any individual's name in place of "John Doe doctor."

The court also discussed with Plaintiff and counsel information that the FDA may have been responsible for Dr. Martin terminating Plaintiff's Neurontin medication which is the subject of Count 14 which is proceeding against Dr. Martin in the First Amended Complaint. (ECF No. 12 at 17.) The court made no determination whether Dr. Martin's apparent stopping of certain medical treatment for Plaintiff (Neurontin) was secondary to any order of the FDA or otherwise. (ECF No. 42 at 3-4.)

**II. DISCUSSION**

---

[6] The court leaves unaddressed how Plaintiff could have made a request to Nurse EJ if he "unresponsive" as the HDSP report reflects. (ECF No. 43-2 at 2.)

Plaintiff's filing (ECF No. 44) seeks an extension of discovery with respect to Nurses Famy and Lopez. It appears that since HDSP records reflect no medical provider on duty, pursuing further discovery with these Nurses would be fruitless. Neither Nurse Famy nor Nurse Lopez is a defendant in this action. Therefore, Plaintiff could not proceed with traditional party-type discovery against them. Even if Plaintiff were to subpoena them to a deposition, from the records, the Attorney General has produced, the identity of the "John Doe doctors" would not be revealed.[7]

The request to continue discovery with respect to the discontinuation of certain medication (Count 14) pertains to Dr. Martin. In Count 14, Plaintiff alleged that Defendant Dr. Martin discontinued Plaintiff's medication in April 2017 without evaluation or for any purpose, leaving Plaintiff without any help for his pain. (ECF No. 11 at 21). In January of 2018, Plaintiff again began receiving the medication he had been taking when he was discharged from Valley Hospital. (*Id.*) Plaintiff alleges that Dr. Martin violated his Eighth Amendment and Fourteenth Amendment rights by discontinuing this medication. (*Id.*) The Court construed these allegations as an Eighth Amendment claim for deliberate indifference to serious medical needs. (ECF No. 12 at 17.)

At this court's hearing on November 13, 2019, Plaintiff Augborne discussed the cessation of the medication (now identified as Neurontin) as being attributable to actions by the Food & Drug Administration (FDA). The court's Minutes of Proceedings read as follows:

> "Plaintiff represents to the court that he has obtained additional information regarding previous claims that were dismissed. Plaintiff states that he has information regarding the FDA possibly being responsible for Dr. Martin stopping his Neurontin medication. DAG Odgers advises that a negative outcome regarding the use of Neurontin during 2016 – 2017

---

[7] As discussed several times above, Plaintiff states he made his request to be seen by a physician not to Nurse Lopez or Nurse Famy but to "Nurse EJ." (ECF No. 11 at 17.) If so, Plaintiff had the opportunity to discuss this assertion (and perhaps find out the name of the doctor) when Deputy Attorney General arranged the Lim-Odgers-Augborne conference call. He apparently did not do so.

8

>occurred which prompted the FDA to investigate its usage. The FDA in 2017 banned the use of the medication which prompted Dr. Martin to discontinue Plaintiff's Neurontin and order an alternative medication to take place. Plaintiff's advises he has now been placed back on Neurontin. The court questions Plaintiff as to the relation between the FDA and the unknown NDOC physician. Plaintiff states that he would like to narrow down who stopped the medication, such as Dr. Martin's supervisor, etc., as he does not believe Mr. Martin had a choice in stopping the Neurontin and prescribing a substitute medication."

\* \* \*

(ECF No. 42 at 3-4.)

Plaintiff's FAC made oblique reference to the role, if any, the FDA played with respect to his Neurontin prescription. At pp. 4-5 of the Screening Order, Judge Jones noted Plaintiff's allegation "Plaintiff was told by nurses and Dr. Martin that neither the State of Nevada nor the NDOC were authorized by the F.D.A. to issue the prescribed medications he was prescribed by the doctors at Valley Hospital." (ECF No. 12 at 4-5; footnote omitted.)

Based upon the information available at present, the court fails to see how, if the FDA ordered Plaintiff's medication could not be administered for treatment of Plaintiff's condition, that this would reflect that Dr. Martin was deliberately indifferent to Plaintiff's serious medical condition. Nevertheless, the court did not deny Plaintiff's inference he might seek to amend his action with respect to the FDA (or an NDOC doctor complying with FDA directives) but instead cautioned Plaintiff to be aware of Judges Jones' admonitions regarding allegations of deliberate indifference or vicarious liability. (ECF No. 42 at 4.) Additionally, the court stated that Dr. Martin and those averments against him in Count 14 remain in this action.

### III. CONCLUSION

Plaintiff has had more than ample time to undertake discovery in this matter as to the identity of "John Doe doctor" and/or the role the FDA played, if any, in Dr. Martin's decision to terminate his medication if discovery is open for another month for Plaintiff to further pursue these claims. However, at the present time, there is no legitimate basis or purpose in extending the discovery deadlines beyond December 20, 2019. District courts have inherent power to control their dockets. *Hamilton Copper & Steel Corp. v. Primary Steel, Inc.,* 898 F.2d 1428, 1429 (9th Cir. 1990); *Oliva v. Sullivan*, 958 F.2d 272, 273 (9th Cir. 1992).

Plaintiff's Motion to Amend the Scheduling Order (ECF No. 44) is **DENIED**.

**IT IS SO ORDERED**.

Dated: November 20, 2019.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE